# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

|  |  |  |
|---|---|---|
|  | ) | CASE NO.  1:04CV1626 |
|  | ) | (Consolidated Cases) |
| In Re: | ) |  |
|  | ) |  |
| **FERRO CORPORATION** | ) | Judge John M. Manos |
| **DERIVATIVE LITIGATION** | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) | **MEMORANDUM OF OPINION** |

On July 11, 2005, Thomas Auletta, Barbara Benscome, and Phillip Miller Trust (collectively, "Lead Plaintiffs") filed the above-captioned case against Ferro Corporation ("Ferro"), Ferro Vice President and Chief Financial Officer Thomas M. Gannon, Ferro Vice President of Performance Chemicals Dale G. Kramer, and the individual members of the Ferro Board of Directors:  Hector R. Ortino,[1] Michael H. Bulkin, Michael F. Mee, William J. Sharp, Alberto Weisser, Sandra Austin Crayton, Jennie S. Hwang, William B. Lawrence, Dennis W. Sullivan, and Padmasree Warrior, alleging violations of the Sarbanes-Oxley Act of 2002 and raising breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment claims.  The consolidated complaint also raises breach of contract, professional negligence, and accounting malpractice claims against KPMG, LLP ("KPMG").

On September 9, 2005, Ferro filed a motion to dismiss.  (Docket No. 32.)  On October 11, 2005, Lead Plaintiffs filed a brief in opposition.  (Docket No. 36.)  On November 10, 2005, Ferro filed a reply.  (Docket No. 38.)

---

[1] Hector R. Ortino died on November 28, 2005.  (Docket No. 39.)

All issues have been fully-briefed and are ripe for adjudication. For the following reasons, Ferro's motion to dismiss (Docket No. 32) is **GRANTED**.

## I. FACTUAL BACKGROUND

Lead Plaintiffs are all Ferro shareholders. (Docket No. 24, "Compl.," at ¶¶15, 16, 18.) Ferro is an Ohio corporation and leading producer of performance materials sold to a broad range of manufacturers serving diverse markets throughout the world. Id. at ¶¶19, 52. It has operations in approximately thirty markets throughout the world and had reported sales of $1.6 billion in Fiscal Year ("FY") 2003. Id. at ¶2, 52. KPMG is a limited liability partnership public accounting firm headquartered in New York, New York. Id. at ¶32. At all relevant times, KPMG served as Ferro's auditor. Id.

From April 22, 2003 to April 27, 2004 (the "Restatement Period") Ferro announced quarterly increases in sales over preceding years. Id. at ¶56-77. Throughout this period however, the Performance Chemical segment, which included the Polymer Additive business, struggled due to low demand and high raw material costs. Id. Nonetheless, Defendants Ortino and Gannon remained optimistic. Id. at ¶¶60-62. Specifically, on February 5, 2004, Defendant Ortino informed the investing public that Ferro had successfully implemented price increases to offset the rise in raw material costs and had substantially reduced costs and discretionary spending. Id. at ¶66. Defendant Gannon predicted a 6-8% increase in the chemical segment for the next quarter in comparison to the preceding year. Id. at ¶67.

On April 27, 2004, Ferro announced its financial results for Q:1 04 and reported a 12.4% revenue increase over the preceding year. Id. at ¶75. With regard to the Performance Chemical segment, Ferro reported an 8.2% revenue increase, attributed to increased demand and pricing.

Id. at ¶77. Defendant Ortino called this a "dramatic recovery" and stated, "[t]he first quarter exceeded our expectations, driven by a stronger demand in our key end markets . . . . we expect this trend to continue through 2004." Id. at ¶76.

However, on July 23, 2004, Ferro surprised the investing public with its announcement that it would have to lower its earnings expectations for the second quarter by more than 70% due to inappropriate accounting entries. Id. at ¶80. According to the press release:

> The second quarter 2004 fully diluted earnings per share from continuing operations are expected to be between $0.10 to $0.12. This compares with the analysts' second quarter earnings estimate range of $0.34 to $0.35 per share. The shortfall is largely the result of poor performance by the Polymer Additives business and charges to be taken in the Polymer Additives business unit to remedy inappropriate accounting entries. . . .
>
> During our financial review process we recently identified several issues in the preliminary results of our Polymer Additives business," commented Hector R. Ortino, chairman and chief executive officer. "Upon a further examination, we determined that the Polymer Additives business unit's performance was well below our expectations and that it will be necessary to take a non-cash charge to earnings related to inappropriate accounting entries."
>
> The second quarter changes stemmed from an internal investigation of accounting entries made in the Company's Polymer Additives business unit, which both overstated the business unit's performance and undetermined the reliability of the forecasting process in that unit.

Id. On the same day, Ferro's market value decreased by 16.2%, from a close of $24.68 per share to a close of $20.68 per share, for a loss of over $167 million. Id. at ¶¶6, 82.

Both the Securities and Exchange Commission ("SEC") and Ferro, through independent legal and accounting firms, are currently investigating the inappropriate accounting entries. Id. at ¶¶81-89. As a result, the Polymer Additives business is scheduled for restructuring, at a cost of $2.1 million. Id. at ¶84. Moreover, the ongoing investigations have revealed that the irregularities date back to FY 01 and extend beyond the Polymer Additives business. Id. at ¶¶9,

85. Although Ferro had initially blamed a former subordinate divisional employee for the irregularities, later investigations identified "isolated instances" of what could be considered discussions of possible inappropriate accounting. Id. at ¶¶85, 88-89.

On April 21, 2005, Defendant KPMG announced that it was "unable to conclude at this time that the investigation was adequate for its purposes." Id. at ¶89. Thus, "the Audit Committee has decided to engage an independent firm specializing in investigations to review the original investigative team's procedures and conclusions." Id. The ongoing investigations have already cost $1.7 million. Id. at ¶95. As a result, according to Lead Plaintiffs, Ferro has been forced to pay fees due to amendments to credit agreements and defenses to securities fraud actions, and suffered debilitating injuries to its reputation and credit worthiness. Id. at ¶¶90-95.

With respect to the individual defendants, Lead Plaintiffs allege that they each knew but concealed from the investing public that:

> (1) Ferro's Polymer Additives business was not profitable and was incurring greater losses than had been reported;
>
> (2) Ferro's efforts to raise the prices of its polymer additives to products to offset increasing "raw materials" cost had been ineffective, further eroding the Company's revenues and profits;
>
> (3) the Company's purportedly improving cost controls, especially regarding the Company's Polymer Additives business, were, in fact, the product of accounting manipulations that deferred and/or materially understated the true operating costs of the business from Ferro's public investors as well as the increasing losses the Company was actually incurring from its Polymer Additives business; and
>
> (4) the Company's disclosure controls and procedures were wholly ineffective contrary to defendant's representations to investors.

Id. at ¶10.

On September 9, 2005, Ferro filed a motion to dismiss raising five issues:

-4-

> (1) Whether plaintiffs have alleged with particularity sufficient facts to excuse their failure to make a pre-suit demand on Ferro's Board of Directors, as Ohio substantive law and Federal Rule of Civil Procedure 23.1 require?
>
> (2) Does the Complaint fail to state a claim under Section 304 of the Sarbanes-Oxley Act, which does not provide for a private right of action?
>
> (3) Does the Complaint plead with requisite particularity that the Individual Defendants breached their fiduciary duties?
>
> (4) Should plaintiffs' alleged breach of fiduciary duty for supposed insider trading / misappropriation of information count be dismissed, given that Ohio law does not recognize such a claim?
>
> (5) Should the Complaint be dismissed on the independent ground that plaintiffs have not complied with Rule 23.1's mandatory verification requirement?

(Docket No. 32, at 9.)

## II.  LEGAL STANDARD

Ferro moves to dismiss the complaint on the ground that it does not state a claim upon which relief can be granted and because Lead Plaintiffs have not shown that making a pre-suit demand upon the directors would have been futile as required under Ohio law. Both claims are brought pursuant to Federal Rule of Civil Procedure 12(b)(6). See Fed. R. Civ. P. 12(b)(6); McCall v. Scott, 239 F.3d 808, 815 (6th Cir. 2001). In deciding a motion to dismiss, the allegations are taken as true and viewed in the light most favorable to the non-movant. A claim will not be dismissed "unless it appears beyond a reasonable doubt that the [non-movant] can prove no set of facts to support his claim which would entitle him to relief." Hiser v. City of Bowling Green, 42 F.3d 382, 383 (6th Cir. 1994); see also Dana Corp. v. Blue Cross & Blue Shield Mutual of Northern Ohio, 900 F.2d 882, 885 (6th Cir. 1990).

Generally, a claim need only give fair notice as to the grounds upon which it rests. In re DeLorean Motor Co., 991 F.2d 1236, 1240 (6th Cir. 1993). However, in a shareholder derivative

suit, a plaintiff must allege, with particularity, that a pre-suit demand was made upon the Board or the reasons for not doing so. See Fed. R. Civ. P. 23.1; Ohio Civ. R. 23.1. This requirement differs substantially from the principles of notice pleading. See McCall, 239 F.3d at 815 (citing Brehm v. Eisner, 746 A.2d 244, 254 (Del. 2000)).

### III.   LAW AND ANALYSIS

In a shareholder derivative action:

> The complaint shall . . . allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort.

See Fed. R. Civ. P. 23. In short, a derivative plaintiff must first demand that the board of directors take the desired action prior to filing suit. If the derivative plaintiff does not make such a demand, he must set forth, with particularity, the reasons for not doing so. Whether these reasons are sufficient to excuse the pre-suit demand requirement is determined under the law of the state of incorporation. Kamen v. Kemper Fin. Servs., Inc. 500 U.S. 90, 108-09 (1991); McCall, 239 F.3d at 815. Here, Ferro is incorporated in Ohio. See Compl., at ¶19.

Under Ohio law, a derivative plaintiff must, with particularity:

> (1) spell out the efforts made to have the directors or the other shareholders take the action demanded, (2) explain why they failed in this effort or did not make it, and (3) show that they "fairly and adequately" represent the interests of other shareholders "similarly situated."

Weston v. Weston Paper & Mfg. Co., 74 Ohio St.3d 377, 379 (1996); Ohio Civ. R. 23.1. The purpose of the pre-suit demand requirement is to give corporate management the first opportunity to institute litigation, a decision ordinarily left to the discretion of the board of directors. Grand Council of Ohio v. Owens, 86 Ohio App.3d 215, 221-22 (10th App. Dist. 1993).

If a plaintiff does not comply with Ohio Civil Rule 23.1, he lacks standing to bring suit. Id. at 220. Indeed, under Ohio law, "no shareholder has an independent right to bring suit unless the board refuses to do so and that refusal is wrongful, fraudulent or arbitrary, or is the result of bad faith or bias on the part of the directors." Drage v. P&G, 119 Ohio App.3d 19, 24 (1st App. Dist. 1997).

Ohio law recognizes an exception to the pre-suit demand requirement "when the shareholder can demonstrate that the demand would have been futile." Id. at 25. In this context, "[f]utility means that the directors' minds are closed to argument and that they cannot properly exercise their business judgment in determining whether the suit should be filed." Id. "It is not enough to show that the directors simply disagree with the shareholder about filing suit." Id. Rather, Ohio law embraces the presumption that "directors can make an unbiased, independent business judgment about whether it would be in the corporation's best interests to sue some or all of the other directors." Id.; See also O.R.C. § 1701.59(C)(1). Thus, "a bare allegation that the directors would not want to sue themselves or each other does not show that demand would be futile." Id. Futility may exist however, when all of the directors are named as defendants, the directors have engaged in self-dealing, or the named defendants dominate the board. Id. at 26. The burden of proof is on the shareholders to establish demand futility. Id.

Here, Lead Plaintiffs concede that no pre-suit demand was made upon the directors. See Compl., at ¶109. Thus, they must establish, with particularity, the reasons for not doing so. See Weston, 74 Ohio St.3d at 379; Ohio Civ. R. 23.1.

At the outset, the Court recognizes that establishing demand futility in Ohio is not an easy task. See e.g. Drage v. P&G, 119 Ohio App.3d 19, 24 (1st App. Dist. 1997); Carlson v.

Rabkin, 152 Ohio App. 3d 672 (1st App. Dist 2003); Doe v. Malkov, 2002 Ohio App. LEXIS 7297 (10th App. Dist. Dec. 31, 2002); Davis v. DCB Financial Corp., 259 F. Supp. 2d 664, 670 (S.D. Ohio 2003) (all refusing to find demand futility); see also In re Ikon Office Solutions, Inc. 194 F.R.D. 166, 190 (E.D. Pa. May 9, 2000) (noting the importance of the demand requirement under Ohio law). As one Ohio appellate court noted, Ohio law statutorily embraces the bedrock principles that "the business and affairs of a corporation are managed by and under the direction of its board" and that "[a]ll acts of a board of directors of an Ohio corporation are presumed to have been taken in good faith." Malkov, 2002 Ohio App. LEXIS at *13. Thus, another Ohio appellate court stated:

> The demand requirement is clearly not a technical procedural requirement. Rather, it serves the very important purpose of ensuring that before a shareholder derivative suit is brought, the company's board of directors has considered all possible intracorporate remedies. . . . Therefore, the corporate management must be given the first opportunity to institute the litigation since, "[a]s a general principle, the responsibility for determining whether or not a corporation shall enforce in the courts a cause of action for damages is, like other business questions, ordinarily a matter of internal management left to the discretion of the directors."

Grand Council, 86 Ohio App. 3d at 221-22 (quoting Smachlo v. Birkelo, 576 F. Supp. 1439, 1443 (D. Del. 1983)).

Here, Lead Plaintiffs argue that a pre-suit demand would be futile because the individual Defendants were complicit in the wrongdoing and would not want to sue themselves. However, Ohio courts have consistently rejected the idea that such bare allegations excuse the demand requirement. See e.g. Drage, 119 Ohio App.3d at 24; Carlson, 152 Ohio App. 3d at 680-81; Malkov, 2002 Ohio App. LEXIS at 12-14; Davis, 259 F. Supp. 2d at 670. Otherwise, derivative plaintiffs could easily circumvent the demand requirement by simply naming the entire board as defendants and alleging that they were complicit in the alleged wrongdoing. See e.g. Kaufman

-8-

v. Kansas Gas & Elec., 634 F. Supp. 1573, 1580 (D. Kan. 1986). Indeed, Ohio law is quite clear that "a bare allegation that the directors would not want to sue themselves or each other does not show that demand would be futile." Drage, 119 Ohio App.3d at 24; Carlson, 152 Ohio App. at 680-81; Malkov, 2002 Ohio App. LEXIS at *12-14; Davis, 259 F. Supp. 2d at 670.

Lead Plaintiffs attempt to satisfy the particularity requirement by alleging that the individual Defendants "failed to establish and maintain internal financial controls . . . [and] tried three times to cover up the scope, extent and endemic nature of the accounting fraud." (Docket No. 36, at 7.) However, these broad and conclusory allegations are based on pure speculation. Lead Plaintiffs do not allege any particular facts whatsoever to establish what roles, if any, the individual Defendants had in causing and/or covering up the accounting irregularities. Instead, they make sweeping allegations that the individual Defendants knew about the irregularities and misled the investing public. However, the only facts alleged to support these broad statements are that the individual Defendants (1) had access to documents, (2) conversed with each other and other employees, (3) attended meetings, and (4) read reports. See Compl., at ¶¶21-29. Yet, Lead Plaintiffs have not plead, with any specificity, which documents, which conversations, which employees, which meetings, or which reports.[2]

In short, Lead Plaintiffs argue that the individual Defendants knew about the alleged wrongdoings because they were directors and did "director-type" things. Such vague and broad allegations would circumvent the demand requirement in almost any derivative suit and are

---

[2] The mere fact that the individual Defendants signed and approved Ferro's annual reports does not mean that they had actual knowledge of the accounting errors contained therein. Even still, mere acquiescence is insufficient to establish demand futility. See Drage, 119 Ohio App. 3d at 29.

-9-

simply insufficient under Ohio law to establish that the directors are "closed to argument and that they cannot properly exercise their business judgment in determining whether the suit should be filed." Drage, 119 Ohio App.3d at 25; see also Carlson, 152 Ohio App. at 680-81; Malkov, 2002 Ohio App. LEXIS at *12-14; Davis, 259 F. Supp. 2d at 670.[3]

The Court likewise rejects the argument that demand would be futile simply because the individual Defendants continue to receive substantial monetary compensation. This argument is simply another variation of the argument that demand would be futile because the directors would not want to sue themselves or expose themselves to liability. Ohio courts have consistently rejected this argument. Drage, 119 Ohio App.3d at 24; Carlson, 152 Ohio App. at 680-81; Malkov, 2002 Ohio App. LEXIS at *12-14; Davis, 259 F. Supp. 2d at 670.

Equally unconvincing is the argument that the individual Defendants' inaction is evidence of their closed-mindedness. Under Ohio law, demand futility is evaluated at the time the lawsuit is filed. Drage, 119 Ohio App. 3d at 26. Nonetheless, the facts illustrate that the individual Defendants have not been inactive. Indeed, they commenced an independent investigation utilizing outside firms and restated quarterly reports. Moreover, as the Sixth

---

[3] Lead Plaintiffs also note that Defendants Weisser and Mee have specialized financial expertise. Thus, according to Lead Plaintiffs, these Defendants should have been able to monitor Ferro's financial records for accuracy and fairness. Even if true, these allegations only establish demand futility with respect to two members of the Board. Lead Plaintiffs must establish demand futility with respect to at least half of the Board. See Drage, 119 Ohio App. 3d at 28-29.

Lead Plaintiffs also note that Defendant Ortino not only had specialized financial expertise, but that he also allegedly profited by selling 23,781 shares of Ferro stock during the relevant period for $620,814. Although these facts may suggest that Defendant Ortino engaged in self-dealing, he is now deceased. (Docket No. 39.) Thus, any alleged self-dealing on his part is irrelevant to the question of whether the remaining individual Defendants can exercise independent judgment.

Circuit recognized, "[i]naction by the Board will not excuse the failure to make a demand because it would deprive the Board of the opportunity to be 'prodded' into action, which is a fundamental goal of the demand requirement." McCall, 239 F.3d at 824 (internal citations omitted).

The Court also rejects the argument that demand would be futile because the individual Defendants are involved in a coverup. The only facts alleged to support Lead Plaintiffs' coverup theory is that (1) the Board blamed a single employee, (2) restructured the Polymer Additives business, (3) restated quarterly reports; and (4) commenced ongoing investigations. Again, these allegations are based on pure speculation and do not articulate with any particularity, what role, if any, the individual Defendants played in any alleged coverup. Incidentally, the fact that the Board commenced an independent investigation utilizing outside firms and restated its quarterly reports to correct past mistakes undercuts any allegations regarding a coverup.

Finally, Lead Plaintiffs argue that a pre-suit demand would be futile because the individual Defendants would be forced to abrogate their insurance coverage if they brought an action against themselves or each other, commonly referred to as the "insured versus insured" allegation. As the sole Ohio court to address this issue stated:

> Certainly, a provision prohibiting directors from bringing suits against each other would deprive the directors of the ability to exercise independent judgment as to the advisability of instituting action against any officer or director for mismanagement, and thereby [divest them] of the power to govern this aspect of the corporation's affairs.

Drage, 119 Ohio App. 3d at 27 (internal citations omitted).

However, the Court does not find Drage authoritative on this point. Rather, the aforementioned language in Drage is dicta and does not appear in the court's syllabus. Indeed,

-11-

as Lead Plaintiffs concede, it was unclear whether the insurance policy in Drage actually prohibited the directors from bringing suit. Id. at 27-28; (Docket No. 36, at 10.) Ultimately, the court refused to excuse the demand requirement. Id. at 26-31.

Moreover, federal courts applying state law are not bound by a single state appellate court decision. Kurczi v. Eli Lilly & Co., 113 F.3d 1426, 1429 (6th Cir. 1997). Rather, a federal court may reject such decisions when other persuasive data support the conclusion that the highest state court would rule otherwise. Id. (Quoting Zeibart Int'l Corp.v. CNA Ins., Cos., 78 F.3d 245, 250 (6th Cir. 1996)). Other persuasive data includes state supreme court dicta, restatements of law, law review commentaries, and the majority rule among other states. Id. (Quoting Garden City Osteopathic Hosp. v. HBE Corp., 55 F.3d 1126, 1130 (6th Cir. 1995)).

Here, several reasons support the rejection of Drage's dicta. First, state and federal courts have almost unanimously rejected the idea that "insured versus insured" exclusions excuse the demand requirement. See e.g. Decker v. Clausen, 1989 Del. Ch. LEXIS 143, at *8 (Del. Ch. Nov. 6, 1989); Specter v. Sidhu, 2004 U.S. Dist. LEXIS 876 (N.D. Tex. Jan. 26, 2004); In re Westinghouse Sec. Litig., 832 F. Supp. 989, 997 (W.D. Pa. 1993); Stoner v. Walsh 772 F. Supp. 790, 805 (S.D.N.Y. 1991); In re Prudential Ins. Co. Deriv. Litig., 282 N.J. Super. 256, 280 (1995); Stepak ex rel. Southern Co. v. Addison, 20 F.3d 398, 411 (11th Cir. 1994); but see In re First Energy Deriv. Litig., 320 F. Supp. 2d 621, 625 (N.D. Ohio 2004). Because most public companies have such insurance exclusions, Lead Plaintiffs' argument would eviscerate the demand requirement altogether. See e.g. In re Prudential, 282 N.J. Super at 280. As one court aptly stated, "[the] assertion that the exclusion automatically renders a board member 'interested' with respect to a decision to reject demand finds no support in either case authority

or logic. Such a rule would preclude rejection of a demand whenever the standard exclusion exists." Stoner, 772 F. Supp. at 805.

Second, the "insured versus insured" argument is simply another variation of the argument that demand would be futile because the directors would not want to sue themselves. Ohio courts have rejected this argument. Drage, 119 Ohio App.3d at 24; Carlson, 152 Ohio App. at 680-81; Malkov, 2002 Ohio App. LEXIS at *12-14; Davis, 259 F. Supp. 2d at 670.

Third, and most persuasive, all three cases relied upon in Drage to support the notion that "insured versus insured" exclusions excuse the demand requirement are no longer good law. Drage cited three cases: Seinfeld v. Bays, 230 Ill. App. 3d 412 (Ill. App. Ct. 1992); First Am. Bank & Trust v. Frogel, 726 F. Supp. 1292 (S.D. Fla. 1989); and Grill v. Hobiltzell, 771 F. Supp. 709 (D. Md. 1991). The first case, Seinfeld, applied Delaware law. However, Delaware courts have consistently rejected the argument. See e.g. Decker, 1989 Del. Ch. LEXIS 143, at *8; Caruana v. Saligman, 1990 Del. Ch. LEXIS 210, *11 (Del. Ch. Dec. 21, 1990). The second case, Frogel, applied both Delaware and Florida law. Again, Delaware has rejected the argument and Florida has since adopted a universal demand requirement, which abolished the demand futility exception altogether. See Fla. Stat. Ann. § 607.07401(2) (2005). Finally, the third case, Grill, applied Maryland law, which has also since rejected the argument. See Werbowsky v. Collomb, 362 Md. 581, 594, 620, 622 (Md. 2001) (affirming dismissal of a derivative suit notwithstanding the existence of an "insured versus insured" exclusion).

Thus, the Court is persuaded that if the Ohio Supreme Court were to address this issue, it would not follow the dicta in Drage and would rather conclude that the existence of an "insured versus insured" exclusion does not excuse pre-suit demands in derivative litigation.

Although the aforementioned allegations, whether considered individually or collectively, might be sufficient under a notice pleading standard, they are insufficient to excuse demand under the particularity requirement, which differs substantially from the principles of notice pleading. See McCall, 239 F.3d at 815 (citing Brehm, 746 A.2d at 254). Specifically, such allegations do not establish that the individual Defendants are "closed to argument and that they cannot properly exercise their business judgment in determining whether the suit should be filed." Drage, 119 Ohio App.3d at 25; see also Carlson, 152 Ohio App. at 680-81; Malkov, 2002 Ohio App. LEXIS at *12-14; Davis, 259 F. Supp. 2d at 670. Moreover, these allegations are insufficient to overcome the presumption that "directors can make an unbiased, independent business judgment about whether it would be in the corporation's best interests to sue some or all of the other directors." Id.[4]

### III. CONCLUSION

In conclusion, Lead Plaintiffs have not sufficiently alleged, with any particularity, that a pre-suit demand upon the Board would be futile. Accordingly, the Court need not address the remaining four substantive issues raised by Ferro in its motion to dismiss.

---

[4] The Court recognizes that on this very day, it is allowing the related ERISA action to go forward. However, ERISA is not governed by the heightened pleading standard that governs the demand requirement in this case. Also, the threshold inquiry in this case is really about corporate governance and who has the right to pursue an action on behalf of the corporation. ERISA simply does not require this type of threshold inquiry.

For the foregoing reasons, the motion to dismiss (Docket No. 32) is **GRANTED**. This case is dismissed, without prejudice for failure to satisfy the requirements of Federal Rule of Civil Procedure 23.1. Each party to bear its own costs.

**IT IS SO ORDERED.**

**Date: March 21, 2006**         */s/ John M. Manos*
                              **UNITED STATES DISTRICT JUDGE**